**BURSOR & FISHER, P.A.**
Sarah N. Westcot (State Bar No. 264916)
701 Brickell Avenue, Suite 2100
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT BONKOWSKI, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WESTERN DENTAL SERVICES, INC.,<br><br>Defendant. | Case No.  8:25-cv-1600<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Robert Bonkowski ("Plaintiff") brings this action individually and on behalf of all others similarly situated against Defendant Western Dental Services, Inc. ("Western Dental" or "Defendant").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Western Dental patients who accessed www.westerndental.com (the "Website") and scheduled an appointment for dental treatment and/or services.

2.      Defendant provides "a full range of dental services" such as  "general dentistry … dental implants and restorative crowns … periodontics, endodontics, orthodontics and extractions … [and] complete oral hygiene services."[1]  Defendant and its affiliates operate 560 dental offices in 20 states that serve over 3 million patients.[2]

3.      When booking dental procedures online, patient privacy is crucial. Patients expect, as they should, that their information will be held in confidence and not shared with third parties without their knowledge or consent.  The sensitive nature of information related to dental procedures, such as those offered by Defendant, amplifies the need for privacy during online bookings.

4.      Moreover, information concerning an individual's healthcare, including dental procedures, is protected by state and federal law.  Despite these protections, and unbeknownst to Plaintiff and Class Members, Defendant aided, employed, agreed, and conspired with Google and AdRoll to intercept sensitive and confidential communications sent and received by Plaintiff and Class Members, including communications containing protected medical information.  Plaintiff brings this action for legal and equitable remedies resulting from these illegal actions.

[1] https://www.westerndental.com/en-us
[2] https://www.westerndental.com/en-us/about-us

## PARTIES

5. Plaintiff is an adult citizen of the state of California, domiciled in Cerritos, California.

6. Plaintiff has maintained a Gmail account at all relevant times when booking his dental appointments on the Website. When creating his Gmail account, Plaintiff was required to provide his full legal name, date of birth, and gender. Additionally, every time Plaintiff accesses his Gmail account, Google collects information related to his IP address and electronic device (e.g. browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes.

7. Plaintiff has booked several dental appointments through the Website over the relevant time period. Plaintiff attended his scheduled medical appointments and received dental treatment for the services he selected. For example, within the last two months, Plaintiff navigated to Defendant's Website to book a dental appointment at Defendant's Buena Park location.[3] Unbeknownst to Plaintiff, Defendant intercepted and/or assisted Google and AdRoll with intercepting his communications, including those that contained personally identifiable information ("PII"), protected health information ("PHI"), and related confidential information.

8. Defendant disclosed this confidential and protected medical information without Plaintiff's knowledge, consent, or express written authorization. As a consequence of these interceptions, Plaintiff has received advertisements marketing various dental procedures, specifically targeted at Plaintiff as a result of Defendant's disclosure of his dental booking information to Google and AdRoll. Defendant breached its duty of confidentiality by unlawfully disclosing Plaintiff's PII and PHI.

9. Defendant Western Dental Services, Inc. is a California corporation with its principal place of business in Orange, California. Defendant owns and

---

[3] The specific dental services scheduled by Plaintiff is omitted to protect Plaintiff's privacy.

operates a national network of dental clinics specializing in a variety of dental services and procedures. Defendant maintains hundreds of clinic locations in multiple states throughout the United States. Defendant owns and operates the Website, whereby consumers seeking to procure medical procedures can schedule both in-person appointments for dental procedures, including at clinics located within California.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367. Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

11. This Court has personal jurisdiction over the parties because the parties reside in California. Further, Defendant has, at all times relevant hereto, systematically and continually conducted business in California, including within this District, and intentionally availed itself of the benefits and privileges of the California consumer market through the promotion, marketing, and sale of its services to residents within this District and throughout California

12. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in this District and Defendant has its principal place of business is in this District.

## FACTUAL ALLEGATIONS

**A.     Background of the California Information Privacy Act**

13. The California Information Privacy Act ("CIPA"), California Penal

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    3

Code § 630, *et seq.*, prohibits aiding or permitting another person to willfully—and without the consent of all parties to a communication—read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from or received at any place within California.

14.    To establish liability under California Penal Code § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

*Or*

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

15.    Section 631(a)'s applicability is not limited to phone lines, but also applies to "new technologies" including computers, the internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                      4

at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' internet browsing history).

16.     Under California Penal Code § 637.2, Plaintiff may seek injunctive relief and statutory damages of $5,000 per violation.

**B.    Background of the California Confidentiality of Medical Information Act**

17.     Pursuant to the California Confidentiality of Medical Information Act ("CMIA"), a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization, except as provided in subdivision (b) or (c)." Cal. Civ. Code § 56.10(a).  "An authorization for the release of medical information . . . shall be valid if it:

(a) Is handwritten by the person who signs it or is in a typeface no smaller than 14-point type.

(b) Is clearly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization.

(c) Is signed and dated . . .

(d) States the specific uses and limitations on the types of medical information to be disclosed.

(e) States the name or functions of the provider of health care, health care service plan, pharmaceutical company, or contractor that may disclose the medical information.

(f) States the name or functions of the persons or entities authorized to receive the medical information.

(g) States the specific uses and limitations on the use of the medical

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    5

information by the persons or entities authorized to receive the medical information.

(h) States a specific date after which the provider of health care, health care service plan, pharmaceutical company, or contractor is no longer authorized to disclose the medical information.

(i) Advises the person signing the authorization of the right to receive a copy of the authorization."

Cal. Civ. Code § 56.11.

18.    Moreover, a health care provider that maintains information for purposes covered by the CMIA is liable for negligent disclosures that arise as the result of an affirmative act—such as implementing a system that records and discloses online patients' personally identifiable information and protected health information.  Cal. Civ. Code § 56.36(c).[4]  Similarly, if a negligent release occurs and medical information concerning a patient is improperly viewed or otherwise accessed, the individual need not suffer actual damages.  Cal. Civ. Code § 56.36(b).

In addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: [¶] (1) ... nominal damages of one thousand dollars ($1,000). In order to recover under this paragraph, it shall not be necessary that the plaintiff suffered or was threatened with actual damages. [¶] (2) The amount of actual damages, if any, sustained by the patient.

*Sutter Health v. Superior Ct.*, 227 Cal. App. 4th 1546, 1551, 174 Cal. Rptr. 3d 653, 656 (2014) (quoting Cal. Civ. Code § 56.36(b)).

---

[4] "Every provider of health care . . . who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care ... who negligently creates, maintains, preserves, stores, abandons, destroys, or disposes of medical information shall be subject to the remedies and penalties provided under subdivisions (b) and (c) of Section 56.36." Cal. Civ. Code § 56.101, subd. (a).

**C. Google's Advertising Technology**

19. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (e.g. Chrome, Safari, Edge, etc.).

20. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

21. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

    a. HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

    b. Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

    c. HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

22. A consumers' HTTP Request essentially asks the Website to retrieve certain information (such as appointment booking information), and the HTTP Response renders or loads the requested information in the form of "Markup" (the

pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

23.    Every website is comprised of Markup and "Source Code."  Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

24.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.  The tracking technologies embedded on the Website by Defendant constitute Source Code and function is a substantially similar way.

25.    Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars.  Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

26.    Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising and brand advertising."[5]  In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

**Figure 1:**

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

---

[5] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    8

27.    Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue.  For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue.  Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

28.    One of these SDKs and tracking pixels is Google Analytics.  Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis.  In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions.  Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

29.    Google continued updating its analytics platform, launching Universal Analytics in 2012.  Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior.  Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

30.    In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

31.    Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                        9

32.    Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[6]  It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[7]

33.    Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site.  This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on.  The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website.  The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

34.    In other words, when interacting with the Website, an HTTP Request is sent to Western Dental's server, and that server sends an HTTP Response including the Markup that displays the website visible to the patient and Source Code, including Google's tracking technologies.

35.    Thus, Defendant is essentially handing their patients a tapped device, and once the webpage is loaded onto the patient's browser, the software-based wiretap is quietly waiting for private communications on the Website to trigger the

---

[6] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).
[7] *Id.*

tap, which intercepts those communications intended only for Defendant and transmits those communications to third parties like Google.

36.    Once Google's software code collects the data intercepted from the Website, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters.  Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

37.    After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages.  These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

38.    In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

39.    The Website utilizes Google's pixel and SDK.  As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the dental treatment being received by the patient.  Google also received additional PII, including the patients' IP address, device information, and User-IDs.

40.     For example, the Website utilizes Google's "cid" or "Client ID" function to identify users as they navigate the Western Dental Website.[8]

41.     In addition to user-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify consumers.  A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

42.     These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

43.     As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[9]

44.     The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it employs much more subtle techniques.[10]  Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

45.     In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[11]

46.     Browser-fingerprints are personal identifiers.  Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

---

[8] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20parameter.

[9] https://www.blog.google/products/chrome/building-a-more-private-web/

[10] https://www.pixelprivacy.com/resources/browser-fingerprinting/

[11] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/

47. As enabled by Defendant, Google collects vast quantities of consumer data through its tracking technology.

48. Due to the vast network of consumer information held by Google, it is able to match the IP addresses, device information, and user-IDs it intercepts and link such information to an individual's specific identity.

49. Google then utilizes such information for its own purposes, such as targeted advertising.

**D.    AdRoll's Advertising Technology**

50. Defendant also installed the AdRoll Tracking Pixel to track patients' every move while navigating the Website.

51. AdRoll operates one of the largest marketing platforms in the country. For "15 years, over 140,000 companies have trusted AdRoll to drive performance they can count on."[12]  Given AdRoll's pervasiveness, AdRoll's audience data includes "1.2 billion internet user profiles and 4.5 billion cross-device identifiers."[13]

52. To unlock the full advantage of its platform, AdRoll provides the AdRoll Tracking Pixel to all its users—including Defendant—who then affirmatively choose to install the pixel code on their websites.[14]

53. As AdRoll puts it, the AdRoll Tracking Pixel "is a . . . code snippet placed in the header of your site that tracks everything your visitors are doing on your site."[15]

54. The AdRoll Tracking Pixel can also connect to AdRoll's advertising partners, including, but not necessarily limited to, Google, Facebook, LinkedIn, Yahoo & Verizon Media Video Exchange, Bidswitch, Xandr, OpenX, Magnite,

---

[12] https://www.adroll.com.

[13] https://www.adroll.com/marketing-platform.

[14] https://www.adroll.com/blog/everything-you-need-to-know-about-pixel-codes; https://www.adroll.com/pixel-set-up.

[15] https://help.adroll.com/hc/en-us/articles/211846018-What-is-the-AdRoll-Pixel.

Index, Pubmatic, Taboola, Outbrain, TripleLift, LiveRamp, and Experian.[16]  This connection can lead to "additional network requests from inventory partners" and allow businesses to "expand the places where [AdRoll] can buy ads" and help AdRoll a business's ad "to the right person at the right time."[17]

55.    AdRoll links the AdRoll Tracking Pixel to AdRoll BidIQ, AdRoll's own machine learning engine, to "work[] with third-party data and [businesses'] existing first-party data to maximize [return on ad spend]."[18]

56.    According to AdRoll, "[F]or over 16 years, BidIQ has been learning about anyone tagged with the AdRoll pixel to efficiently and cost-effectively bid on ad placements."[19]

57.    The "_adroll" cookie is used to "identify the visitor across visits and devices.  It is used by real-time bidding for advertisers to present relevant advertisement."[20]  The "_adroll_shared" cookie is used to "[c]ollect[] data on the user across websites – This data is used to make advertisement more relevant"[21] Both cookies remain on users' browsers for 395 days.[22]

58.    Through the AdRoll Tracking Pixel and the "_adroll" and "_adroll_shared" cookies, AdRoll monitors users across platforms and links them with the intercepted data.

59.    AdRoll views and processes every piece of information collected from the AdRoll Tracking Pixel, including the information collected from Defendant's Website, and uses it to assist with data analytics, marketing, and targeted advertising.

---

[16] https://help.adroll.com/hc/en-us/articles/460004450251-AdRoll-Pixel-Partners.
[17] *Id.*
[18] https://www.adroll.com/blog/adrolls-third-party-data-providers-drive-campaign-performance.
[19] *Id.*
[20] https://criticalarc.com/cookie-policy.
[21] *Id.*
[22] *Id.*

60.    AdRoll partners with Defendant in its marketing efforts.

61.    The Website utilizes the AdRoll Tracking Pixel and "_adroll" and "_adroll_shared" tracking cookies in the manner described throughout this Complaint.  As a result, AdRoll intercepted patients' interactions on the Website, including their PII and PHI.  AdRoll received at least "Custom Events" and URLs that disclosed the specific dental treatment being received by the patient.

62.    AdRoll collects vast quantities of consumer data through its tracking technology.  Due to the vast network of consumer information held by AdRoll, it links such information to an individual's specific identity.

63.    AdRoll then utilizes that information to train its BidIQ program, and for targeted advertising.

**E.    Defendant Disclosed Plaintiff's and Class Members' Protected Health Information**

64.    Defendant's patients access the Website to book appointments for various medical procedures.

65.    During the appointment booking process, Defendant disclosed their patients' PII and PHI to Google as well, as shown below:

**Figure 2:**

66.    Similar PHI is shared with known data brokers, such as AdRoll:

**Figure 3:**

67.    When patients book their appointments on Defendant's Website, Defendant intercepts information related to their patients' appointments through the tracking technologies, including the specific treatment sought by each patient.

68.    Defendant further discloses to Google and AdRoll the PII of its patients' sufficient for Google and AdRoll to uncover their identities.  In the HTTP communications shown in Figures 2-3, the patients' IP address is inherently included

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    16

in every network request.  In addition to its patients' IP address, Defendant, through the tracking technologies, disclosed information about each patient's specific devices and user-IDs, allowing Google and AdRoll to link such information to an individual's specific identity.

69. As shown and described above, Plaintiff's communications with Defendant were disclosed by Defendant to Google and AdRoll and/or intercepted in transit by Google and AdRoll, in real time, via detailed URLs, which contain the medically sensitive information entered into the Website.

70. Defendant also uses and causes the disclosure of data sufficient for Google and AdRoll to create a browser-fingerprint identifier with each re-directed communication described herein, including patient communications concerning individual medical appointments.

71. Defendant sent out these identifiers (e.g. cid, IP address, and device information) with each patient's "event" data.

72. Plaintiff never consented, agreed, authorized, or otherwise permitted Google and AdRoll to intercept his confidential health information.

73. Plaintiff never consented, agreed, authorized, or otherwise permitted Defendant to share his confidential health information.  Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violate federal and state law.

74. By law, Plaintiff is entitled to privacy in his protected health information and confidential communications.  Defendant deprived Plaintiff of his privacy rights when it implemented a system that surreptitiously tracked and recorded Plaintiff's and other online consumers' confidential communications, personally identifiable information, and protected health information.

**F.      Warning on Tracking Codes on Health Care Websites**

75. The federal government has issued guidance warning that tracking codes like Google tracking technologies and AdRoll Tracking Pixel may violate

federal privacy law when installed on healthcare websites such as Defendant's. The statement titled, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (the "Bulletin"), was issued by the Department of Health and Human Services' Office for Civil Rights ("OCR") in December 2022.[23]

76. Healthcare organizations regulated under the Health Insurance Portability and Accountability Act (HIPAA) may use third-party tracking tools, such as Google tracking technologies, in a limited way, to perform analysis on data key to operations. They are not permitted, however, to use these tools in a way that may expose patients' PHI to these vendors. The Bulletin explains:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures***.[24]

77. The bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, ***discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI***. Such disclosures can reveal incredibly sensitive information about an individual, ***including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment***. While

---

[23] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[24] *Id.* (Emphasis added).

---

it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, *because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.*[25]

78.    Plaintiff and Class members face the risks about which the government expresses concern.  Defendant disclosed the fact that Plaintiff's and Class members' booked body contouring medical procedures on Defendant's Website, which in turn also discloses the health conditions for which they seek a health care provider; the frequency with which they take steps relating to dental health; and where they seek medical treatment. This information is, as described by the OCR in its bulletin, "highly sensitive."

79.    The Bulletin goes on to make clear how broad the government's view of protected information is.  It explains:

This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, *or any unique identifying code*.[26]

80.    Crucially, that paragraph in the government's Bulletin continues:

*All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services.* This is because, *when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus*

---

[25] *Id.* (Emphasis added).
[26]    *Id.* (Emphasis added).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    19

***relates to the individual's past, present, or future health or health care or payment for care***.[27]

81.     Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.

> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."

> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."

> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information

---

[27]     *Id*. (Emphasis added).

about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.

In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment.

. . . Through its recent enforcement actions against BetterHelp, GoodRx and Premom, as well as recent guidance from the FTC's Office of Technology, the FTC has put companies on notice that they must monitor the flow of health information to third parties that use tracking technologies integrated into websites and apps. The unauthorized disclosure of such information may violate the FTC Act and could constitute a breach of security under the FTC's Health Breach Notification Rule . . . .[28]

82.    The FTC is unequivocal in its stance.  The FTC has specifically informed healthcare companies, like Defendant, that they should not use tracking technologies to collect sensitive health information and disclose it to third party advertising platforms without informed consent:

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce.  This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.

---

[28]    FEDERAL TRADE COMMISSION, FTC AND HHS WARN HOSPITAL SYSTEMS AND TELEHEALTH PROVIDERS ABOUT PRIVACY AND SECURITY RISKS FROM ONLINE TRACKING TECHNOLOGIES, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking.

> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[29]

83. Therefore, Defendant's conduct is directly contrary to clear pronouncements by the FTC and HHS.

84. In light of, and in addition to, the federal government's own issued guidance above, news sources also warn that tracking code, like Google tracking technologies and AdRoll Tracking Pixel, poses risks of violating federal privacy law and HIPAA:

> Federal regulators are warning [regulated entities] hospital systems and telehealth providers about the data privacy risks of using third-party tracking technologies.

> These services, like…Google Analytics, could violate the Health Insurance Portability and Accountability Act (HIPAA) or Federal Trade Commission (FTC) data security rules, officials said.

> The FTC and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) issued a rare joint release announcing that 130 [regulated entities] hospital systems and telehealth providers received a letter warning them about the data privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps … "The compliance buck still stops with you. Furthermore, your company is legally responsible even if you don't use the data obtained through tracking technologies for marketing purposes."[30]

85. Fierce Healthcare also spoke up in an April 3, 2023 article:

> Nearly all nonfederal acute care hospitals' [regulated entities'] websites track and transfer data to a third party, potentially fueling the unwanted disclosures of patients' sensitive health information and opening up that [regulated entity] hospital to legal liability, according to a recently

[29] https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach

[30] Heather Landi, *Regulators warn hospitals and telehealth companies about privacy risks of Meta, Google tracking tech*, FIERCE HEALTHCARE, July 21, 2023, https://www.fiercehealthcare.com/health-tech/regulators-warn-hospitals-and-telehealth-companies-about-privacy-risks-meta-google.

published University of Pennsylvania analysis. [https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2022.01205]. The census of more than 3,700 hospital [regulated entity] homepages found at least one third-party data transfer among 98.6% of the websites as well as at least one third-party cookie on 94.3%, researchers wrote in Health Affairs.

The hospitals' [regulated entities'] homepages had a median of 16 third-party transfers, more of which were found among medium-sized (100 to 499 beds) hospitals, nonprofit hospitals, urban hospitals, health system-affiliated hospitals and those that weren't serving the largest portion of patients in poverty, they wrote … Many of these complaints cite Facebook parent company Meta's Pixel tracker, which a June 2022 investigation from The Markup [https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites] detected on about a third of large hospitals' websites. That report found evidence that, in some instances, the sensitive data transferred to third parties met the criteria for a HIPAA violation.[31]

86.    Health Affairs also published an article in April 2023, stating in relevant part:

By including third-party tracking code on their websites, hospitals [regulated entities] are facilitating the profiling of their patients by third parties. These practices can lead to dignitary harms, which occur when third parties gain access to sensitive health information that a person would not wish to share. These practices may also lead to increased health-related advertising that targets patients, as well as to legal liability for hospitals [regulated entities].[32]

87.    This is further evidence that the data that Defendant chose to share is protected PHI and PII.  The sharing of that information was a violation of Class members' rights.

---

[31] Dave Muoio, *Almost every hospital's homepage is sending visitors' data to third parties, study finds*, FIERCE HEALTHCARE, Apr. 3, 2023, https://www.fiercehealthcare.com/providers/almost-every-hospital-homepage-sending-visitors-data-third-parties-study-finds.

[32] Ari B. Friedman, et al., *Widespread Third-Party Tracking On Hospital Websites Poses Privacy Risks For Patients And Legal Liability For Hospitals*, HEALTH AFFAIRS, Vol. 42, No. 24, April 2023, https://www.healthaffairs.org/doi/10.1377/hlthaff.2022.01205.

## CLASS ACTION ALLEGATIONS

88.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of a class defined as all natural persons in the United States who, during the class period, booked an appointment on the Website (the "Class").

89.     Plaintiff also brings this action on behalf of a subclass defined as all natural persons in California who, during the class period, booked an appointment on the Website (the "California Subclass").

90.     Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of subclasses.

91.     The "Class Period" is the time beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

92.     Excluded from the Classes is Defendant; any affiliate, parent, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant; any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his/her spouse and immediate family members; and members of the judge's staff.

93.     Numerosity.  Members of the Classes are so numerous that joinder of all members is impracticable.  The exact number of Class Members is unknown to Plaintiff at this time; however, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records.

94.     Typicality.  Plaintiff's claims are typical of the claims of the Classes because Plaintiff used the Website to schedule a medical appointment and had her

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    24

personally identifiable information and protected health information disclosed to Google and AdRoll without their express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class members.

95.    Adequacy.  Plaintiff is prepared to take all necessary steps to represent fairly and adequately the interests of the Class members.  Plaintiff's interests are coincident with, and not antagonistic to, those of the members of the Classes. Plaintiff is represented by attorneys with experience in the prosecution of class action litigation, generally, and in the emerging field of digital privacy litigation, specifically.  Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the members of the Classes.

96.    Commonality.  Questions of law and fact common to the members of the Classes predominate over questions that may affect only individual members of the Classes because Defendant has acted on grounds generally applicable to the Classes.  Such generally applicable conduct is inherent in Defendant's wrongful conduct.  Questions of law and fact common to the Classes include:

a.    Whether Defendant intentionally tapped the lines of internet communication between patients and their healthcare provider;

b.    Whether the Website surreptitiously recorded personally identifiable information, protected health information, and related communications and subsequently, or simultaneously, disclosed that information to Google and AdRoll;

c.    Whether Google and AdRoll are third-party eavesdroppers;

d.    Whether Defendant's disclosures of personally identifiable information, protected health information, and related communications constituted an affirmative act of communication;

e.    Whether Defendant's conduct, which allowed Google and AdRoll—unauthorized persons—to view Plaintiff's and Class

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    25

members' personally identifiable information and protected health information, resulted in a breach of confidentiality;

f.    Whether Defendant violated Plaintiff's and Class members' privacy rights by using Google and AdRoll's tracking technologies to record and communicate patients' confidential medical communications;

g.    Whether Plaintiff and Class members are entitled to damages under the ECPA, CIPA, the CMIA, or any other relevant statute; and

h.    Whether Defendant's actions violated Plaintiff's and Class members' privacy rights as provided by the California Constitution.

97.    <u>Superiority</u>.  Class action treatment is the superior method for the fair and efficient adjudication of this controversy.  Such treatment permits a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in the management of this class action.  Plaintiff knows of no special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

**CLAIMS FOR RELIEF**

**COUNT I**
**Violation of the Electronic Communications Privacy Act,**
**18 U.S.C. § 2511(1)**

98.    Plaintiff repeat the allegations contained in the paragraphs above as if

fully set forth herein and brings this count individually and on behalf of the members of the Class.

99. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

100. The ECPA protects both sending and the receipt of communications.

101. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

102. The transmission of Plaintiff's private and confidential information to Defendant's Website qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

103. The transmission of the private and confidential information between Plaintiff and Class members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

104. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

105. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

106. The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

107. The following instruments constitute "devices" within the meaning of the ECPA:

    a.    The computer codes and programs Google and AdRoll used to track Plaintiff and Class members communications while they were navigating the Website;

    b.    Plaintiff's and Class members' browsers;

    c.    Plaintiff's and Class members' mobile devices;

    d.    Defendant's, Google's, and AdRoll's web and ad servers;

    e.    The plan Defendant, Google, and AdRoll carried out to effectuate the tracking and interception of Plaintiff's and Class members' communications while they were using a web browser to navigate the Website.

108. Plaintiff and Class members' interactions with Defendant's Website are electronic communications under the ECPA.

109. By utilizing and embedding Google and AdRoll's tracking technologies on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

110. Specifically, Defendant intercepted Plaintiff's and Class members' electronic communications through Google and AdRoll's tracking technologies, which tracked, stored and unlawfully disclosed Plaintiff's and Class members' private and confidential information to third parties, such as Google and AdRoll.

111. Defendant intercepted or assisted in the interception of communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class members regarding private and confidential information, including their treatment information. This confidential information was then monetized for targeted advertising purposes.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED    28

112.   By intentionally disclosing or endeavoring to disclose Plaintiff's and Class members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

113.   By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

114.   Defendant intentionally intercepted or intentionally assisted in the interception of the contents of Plaintiff's and Class members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

115.   The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.  Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3), as well as the FTC Act and the CMIA.  42 U.S.C. § 1320d-6(a)(3) imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to

an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[33]

116.   Plaintiff's information that Defendant disclosed to Google and AdRoll qualifies as IIHI, and Defendant violated Plaintiff's and Class members' expectations of privacy.  Such conduct constitutes tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6.  Defendant used the wire or electronic communications to increase their profit margins.  Defendant specifically used Google and AdRoll's tracking technologies to track and utilize Plaintiff's and Class members' private and confidential information for financial gain.

117.   Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

118.   Plaintiff and Class members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy through Google and AdRoll's tracking technologies.  Plaintiff and Class members had a reasonable expectation that Defendant would not intercept or assist in the interception of their private and confidential information without their knowledge or consent.

119.   The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq.*

120.   As a result of each and every violation thereof, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

### COUNT II
**Violation of the California Invasion of Privacy Act,
Cal. Penal Code § 631**

121.   Plaintiff repeats the allegations contained in the paragraphs above as if

---

[33] 42 U.S.C. § 1320d-6.

fully set forth herein and brings this count individually and on behalf of the members of the California Subclass.

122.   The California Invasion of Privacy Act ("CIPA") is codified at California Penal Code sections 630 to 638.  CIPA begins with its statement of purpose – namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

123.   A person violates California Penal Code § 631(a), if:

> by means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

124.   Further, a person violates Section 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph. *Id.*

125.   To avoid liability under Section 631(a), a defendant must show it had the consent of **all** parties to a communication.

126.   At all relevant times, Defendant aided, agreed with, and conspired Google and AdRoll to track and intercept Plaintiff and Class members' internet

communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class members.

127.   Defendant, when aiding and assisting Google's and AdRoll's wiretapping and eavesdropping, intended to help Google and AdRoll learn some meaning of the content in the URLs and the content the visitor requested.

128.   The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, Google tracking technologies fall under the broad catch-all category of "any other manner":

     a.    The computer codes and programs Google used to track Plaintiff and Class members' communications while they were navigating the Website;

     b.    Plaintiff's and Class members' browsers;

     c.    Plaintiff's and Class members' computing and mobile devices;

     d.    Google's and AdRoll's web and ad servers;

     e.    The web and ad-servers from which Google and AdRoll tracked and intercepted Plaintiff's and Class members' communications while they were using a web browser to access or navigate the Website;

     f.    The computer codes and programs used by Google and AdRoll to effectuate its tracking and interception of Plaintiff's and Class members' communications while they were using a browser to visit the Website; and

     g.    The plan Google and AdRoll carried out to effectuate their tracking and interception of Plaintiff's and Class members' communications while they were using a web browser or mobile device to visit the Website.

129.   The information that Defendant transmitted using Google and AdRoll's tracking technologies, including the type of procedure a patient is interested in constituted sensitive and confidential personally identifiable information.

130.   As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting third parties to receive its customers' sensitive and confidential online communications through the Website without their consent.

131.   As a result of the above violations, Defendant is liable to Plaintiff and other members of the California Subclass in the amount of, the greater of, $5,000 dollars per violation or three times the amount of actual damages.  Additionally, California Penal Code section 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages."

132.   Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

**COUNT III**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56.10**

133.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

134.   Under the California Confidentiality of Medical Information Act, California Civil Code section 56.10 ("CMIA"), providers of health care are prohibited from disclosing medical information relating to their patients without a patient's authorization.  Medical information refers to:

> any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding

a patient's medical history, mental or physical condition, or treatment. "Individually Identifiable" means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual . . . .

135.  Plaintiff and Class members are patients under the definition of the CMIA because Plaintiff and Class members received "health care services from a provider of health care" and the information Defendant shared to Google and AdRoll was "medical information pertain[ing]" to Plaintiff and Class members.  Cal. Civ. Code § 56.05(m).

136.  Defendant is considered a "provider of health care" under California Civil Code section 56.06, subdivisions (a) and (b), because Defendant's Website maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, of for the diagnoses, treatment, or management of a medical condition.

137.  Therefore, as a provider of health care, Defendant is subject to the requirements of the CMIA and have an ongoing obligation to comply with the CMIA's requirements regarding the maintenance of its user's medical information.

138.  As set forth hereinabove, Google and AdRoll utilize user-IDs, in addition to utilizing Class member's IP addresses and device information to specifically identify each individual Class member with their Gmail account.  Along with these cookies and other identifiers, Defendant disclosed to Google and AdRoll several pieces of information regarding its patients' use of Defendant's Website, which included, but was not limited to, patient medical conditions and appointment details for dental services.

139.  This patient information was derived from a provider of health care regarding patients' medical treatment and physical condition.  Accordingly, it constituted medical information pursuant to the CMIA.

140.  As demonstrated hereinabove, Defendant failed to obtain its patients' valid authorization for the disclosure of medical information.

141.  Pursuant to CMIA section 56.11, a valid authorization for disclosure of medical information must: (1) be "[c]learly separate from any other language present on the same page and is executed by a signature which serves no other purpose than to execute the authorization;" (2) be signed and dated by the patient or her representative; (3) state the name and function of the third party that receives the information; and (4) state a specific date after which the authorization expires. Defendant failed to obtain such authorization prior to disclosing its patients' medical information.

142.  Based on the above, Defendant violated the CMIA by disclosing its patients' medical information to Google and AdRoll.

143.  Under the CMIA, a patient may recover compensatory damages, punitive damages not to exceed $3,000 dollars and attorneys' fees not to exceed $1,000, and the costs of litigation for any violating disclosure of medical information.  Cal. Civ. Code §56.35.  Alternatively, a patient may recover nominal damages of $1,000 for any negligent release of medical information.  Cal. Civ. Code §56.36.

144.  Pursuant to California Penal Code section 637.2, Plaintiff and Class members have been injured by the violations of California Penal Code section 635, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
### Invasion of Privacy Under California's Constitution

145.  Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein and brings this claim individually and on behalf of the proposed California Subclass.

146.   Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their sensitive, confidential online communications and protected health information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class members' knowledge or consent.

147.   At all relevant times, by using Google and AdRoll's tracking technologies to record and communicate patients' sensitive and confidential online medical communications, Defendant intentionally invaded Plaintiff's and Class members' privacy rights under the California Constitution.

148.   Plaintiff and Class members had a reasonable expectation that their sensitive and confidential online communications, identities, health information, and other data would remain confidential, and that Defendant would not install wiretaps on the Website.

149.   Plaintiff and Class members did not authorize Defendant to record and transmit Plaintiff's and Class members' private medical communications alongside their personally identifiable health information.

150.   This invasion of privacy was serious in nature, scope, and impact because it related to patients' private medical communications.  Moreover, it constituted an egregious breach of the societal norms underlying the privacy right.

151.   Accordingly, Plaintiff and Class members seek all relief available for invasion of privacy claims under California's Constitution.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For a determination that this action is a proper class action;

---

(b) For an order certifying the Classes, naming Plaintiff as representative of the Classes, and naming Plaintiff's attorneys as Class Counsel to represent the Classes;

(c) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(d) For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(e) An award of statutory damages to the extent available;

(f) For punitive damages, as warranted, in an amount to be determined at trial;

(g) For prejudgment interest on all amounts awarded;

(h) For injunctive relief as pleaded or as the Court may deem proper; and

(i) For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## JURY TRIAL DEMANDED

Plaintiff, individually and on behalf of the proposed Classes, demands a trial by jury for all of the claims asserted in this Complaint so triable.

Dated: July 22, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: ____ */s/ Sarah N. Westcot* ____

Sarah N. Westcot (State Bar No. 264916)
701 Brickell Ave., Suite 2100
Miami, FL 33131-2800
Telephone: (305) 330-5512
Facsimile: (305) 676-9006
Email: swestcot@bursor.com

*Counsel for Plaintiff*